UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE
2019 FEB 14  PM 1: 50

Mohammad Ariff Saidin, Syed Farhaj Hassan,
The Council of Imams in New Jersey,
Muslim Student Association of the U.S. and
Canada, Inc, All Body Shop
Inside & Outside, Unity Beef
Sausage Company, Muslim
Foundation Inc, Moiz Mohammed,
Jane Doe, Sofia Tahir, Zaimah
~~City of New York~~
Abdur Rahim, Abdul Hakim Abdullah

Write the full name of each plaintiff.

___ CV ___
(Include case number if one has been assigned)

**19 CV 1448**

**COMPLAINT**

Do you want a jury trial?
☒ Yes   ☐ No

AGAINST   City of New York

Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

Please see attached papers.

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

---

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☒   **Federal Question**

☐   **Diversity of Citizenship**

### A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

Monell claim.

First Amendment for religious liberty,

Fourthteenth Amendment for Equal

Protection.

### B.   If you checked Diversity of Citizenship

#### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of
              (Plaintiff's name)

_____

(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
                        (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____.

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II. PARTIES

### A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

Mohammad          A          Saidin
First Name              Middle Initial        Last Name

639 Rosedale Avenue, Apt. 1B
Street Address

Bronx          New York          10473
County, City          State          Zip Code

347-918-1705          MohammadAriffSaidin @
Telephone Number          Email Address (if available)   hotmail.com

Page 3

## B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

*City of New York,*

First Name                         Last Name

*New York City Police Dept.,*

Current Job Title (or other identifying information)

*Corporation Counsel, 100 Church St,*

Current Work Address (or other address where defendant may be served)

*New York,        NY        10007*

County, City                         State                         Zip Code

Defendant 2:

First Name                         Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                         State                         Zip Code

Defendant 3:

First Name                         Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                         State                         Zip Code

Defendant 4:

First Name                          Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                  State              Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: *The Supreme Court of the United States*

Date(s) of occurrence: *January 8, 2018*

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

*Please see all attached papers.*

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

The NYPD Muslim Surveillance Program has exacerbated my mental health issues and medical problems as well as treated by the Metropolitan Hospital Center.

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

I want the court to either accept my amended Complaint with the same case number 19-CV-168 or assign to me a new case number. Preferably, please accept my amended Complaint as 19-CV-168. Please award ten million dollars as compensatory, exemplary, punitive and general damages in my favor against the City of New York.

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

Feb. 12, 2019                    Mohammad Ariff Saidin
Dated                            Plaintiff's Signature

Mohammad           A           Saidin
First Name          Middle Initial    Last Name

639 Rosedale Avenue, Apt. 1B
Street Address

Bronx              New York      10473
County, City        State         Zip Code

347-918-1705       MohammadAriffSaidin@hotmail.com
Telephone Number    Email Address (if available)

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☒ Yes    ☐ No

> If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

PLAINTIFFS,

MOHAMMAD ARIFF SAIDIN; SYED FARHAJ HASSAN;

THE COUNCIL OF IMAMS IN NEW JERSEY;

MUSLIM STUDENT ASSOCIATION OF THE U.S. AND CANADA, INC;

ALL BODY SHOP INSIDE & OUTSIDE; UNITY BEEF SAUSAGE COMPANY;

MUSLIM FOUNDATION INC; MOIZ MOHAMMED; JANE DOE;

SOOFIA TAHIR; ZAIMAH ABDUR RAHIM; ABDUL HAKIM ABDULLAH

AGAINST

Dear judge,
    Please either retain
19-CV-168 as my amended
complaint or assign to me
a new case number. Thanks.
                    MAS

DEFENDANT,

CITY OF NEW YORK

19-CV-168

AMENDED COMPLAINT

Do you want a jury trial?

Yes, I do.

Dear judge,
    Please re-open my
case here because I have
amended to include many
instances of wrongful
conduct by law enforce-
ment agents. Thanks,
            MAS   1-8

On January 8, 2018 as a result of error or mistake by the Corporation Counsel of the City of New York in bad faith for failing to confess that the NYPD Muslim Surveillance Program as an official policy of the City of New York is unconstitutional, I, Mohammad Ariff Saidin, is now the Lead Paintiff in my Amended Complaint against the City of New York, 19-CV-168 here as Syed Farhaj Hassan was the Lead Plaintiff in *Hassan v. City of New York*, No. 14-1688 by the Third Circuit on Oct. 13, 2015 that emphatically overturned a New Jersey district court, which had <u>dismissed</u> a challenge to the New York City Police Department's Muslim surveillance program. Subsequently, Lead Plaintiff Mohammad Ariff Saidin and others of or associated with the Islamic faith (collectively "Plaintiffs") assert that, since January 2002, the City has through the NYPD conducted the Program in secret to monitor the lives of Muslims, their businesses, houses of worship, organizations, and schools in New York City and surrounding states, particularly New Jersey. The fundamental injury alleged by the Plaintiffs is unequal treatment on the basis of religion regarding the NYPD Surveillance Program's discriminatory focus on Muslims because of the belief that Muslim religious identity is a permissible proxy for criminality.

My Amended Complaint alleges that the NYPD has been using a variety of methods to spy on Muslims which has been described with detailed examples in *Hassan v. City of New York*, No. 14-1688 by the Third Circuit on pages 11 to 15 for the court to see as a reference so as not

to be redundant for me to repeat them here. In fact, in discussing the surveillance, (former) Mayor Bloomberg stated publicly that "We're doing the right thing. We'll continue to do the right thing." In addition, (former) Police Commissioner Kelly said that "We're going to continue to do what we've to do to protect the City," indicating that their official proclamations falsely suggest that Muslims alone still present a unique law enforcement threat, since the City officials believed the NYPD's targeting of Muslims for surveillance on the basis of their religion has been appropriate and should continue.

As a result, Plaintiffs largely contend that because of the Program's alleged stigmatizing and reputational consequences, the surveillance has not only been affecting our worship and religious activities, but also our current or prospective jobs and careers. For example, Lead Plaintiff Mohammad Ariff Saidin has not one incident only but several discriminatory or wrongful conduct incidents based on my Muslim religious identity as I already stated in my Appeal Brief beginning from The Appellate Division, First Department onward asking for each court concerned to see *Hassan v. City of New York*, No. 14-1688 by the Third Circuit on the unconstitutionality of the NYPD Muslim Surveillance Program against Muslim Plaintiffs including myself.

Incidents of Wrongful Conduct

3 -8

My first incident was on June 12, 2007 at about 6:15 pm where Police Officer Beume and partner refused to trace down and arrest my two non-Muslim teenage assailants for throwing a stick that hit my back, repeatedly punching, and spitting on me. One of them was later identified as Qiyanah Wright. My second incident was on June 29, 2007 at about 6:20 pm where Police Officer Sam Negron and partner falsely arrested and incarcerated me for assault, but my two non-Muslim assailants where one of them who again repeatedly punched and spat on me later identified as Qiyanah Wright were both never arrested. My third incident was later that night, my non-Muslim assailant cellmate inside our police lock-up jail was neither charged nor arrested by officer Sam Negron who heard a loud slapping sound and saw a swelling red mark on my chest. My fourth incident was after that, I later requested but was repeatedly denied medications by a police sergeant lock-up jail guard who sometimes showed up to my two daytimes and three nights there. My fifth incident was at my first criminal arraignment, the male Assistant for the Bronx District Attorney mentioned my assault victim's swelling on her face right side with hospitalization without mentioning spitting but failed to produce any medical note from any hospital nor a photo of her swelling face from Police Officer Sam Negron and his supervisor. My sixth incident was the female Assistant for the Bronx District Attorney mentioned only spitting with no mention of assault nor swelling to keep me incarcerated. My seventh incident was

inside the Rikers Island dormitory prison, where I was daily and nightly for about two weeks exposed to my fellow inmates secondhand smokes who received no smoking summons at all from the prison guards there in violation of the New York City Smoking Ordinance.  Finally, my eighth incident was in response to my calling the 43rd Police Precinct, Sergeant Nolac (Black) and his white partner visited me at home on August 7, 2007 at about 7:11 pm where I asked them to arrest my two teenage assailants and my assailant cellmate but no arrests for me to sign the criminal charges.

Subsequently, even though I have been completely restored to the position before my false arrest as per the Disposition, these incidents of wrongful conduct by law enforcement surveillance have exacerbated my mental depression, paranoia, fear of panic attacks and other complicated mental as well as medical problems as treated by the Metropolitan Hospital Center for me to less and less attend mosques as well as refrain from religious discussions and to inhibit me from resuming my teaching career with the mostly non-Muslim  hyperactive students in the public school system because my Muslim identity can more likely cause NYPD officers to again discriminate against me should I get into any confrontation against any of my virtually all non-Muslim fellow colleagues and/or typically hyperactive non-Muslim students as well.

In comparison, each of the Plaintiffs has, at least, one incident of wrongful conduct by law enforcement surveillance affecting each of them. For example, Plaintiff Hassan asserts one incident of himself as a soldier in the U.S. Army who has worked in military intelligence that he has decreased his mosque attendance significantly because of his belief that being closely affiliated with mosques under surveillance by law enforcement will jeopardize his ability to hold a security clearance and will tarnish his reputation among his fellow soldiers and diminish their trust in him. Likewise, Plaintiffs Moiz Mohammed, Jane Doe, and Sofia Tahir state that they have been avoiding from discussing their faith openly or at MSA meetings for fear of being watched and documented . In addition, Plaintiff Mohammed alleges that the stigma now attached to being a Muslim member of the MSA has caused him to avoid discussing his faith or his MSA participation in public and to avoid praying in places where non-Muslims might see him doing so.

The individual Plaintiffs are not the only ones affected by wrongful conduct of law enforcement surveillance. The organizational Plaintiffs allege that the Program has undermined their ability to fulfill their mission by deterring potential members from joining and casting doubt on their ability to maintain the confidentiality of their membership. Accordingly, two mosques that are members of Plaintiff Council of Imams in New Jersey, and that are named in the NYPD's Newark report have seen a decline in attendance resulting from the NYPD's

6-8

surveillance because their congregants can no longer worship freely knowing that law enforcement agents or informants are likely in their midst. Similarly situated are student groups and MSAs subject to surveillance are diminished in their ability to establish viable student organizations that students feel secure joining  and participating in and are less able to embark upon integral partnerships with campus administrators and other organizations and to fulfill the spiritual needs of their members in a confidential manner. Subsequently, Plaintiff MFI (Muslim Foundation Inc) has changed its religious and educational programming to avoid controversial topics likely to stigmatize its membership further and to attract additional NYPD attention.

In conclusion, several Plaintiffs also contend that financial harm has affected their alleged religious, reputational, and stigmatizing injuries. For example, Plaintiffs All Shop Body Inside & Outside and Utility Beef Sausage Company claim that the surveillance has damaged their businesses by scaring away customers. Namely, Plaintiffs Zaimah Abdur Rahim and Abdul Hakim Abdullah allege that the publication of the address and a photograph on the internet of their home in connection with the NYPD's surveillance has decreased its value and diminished its prospects for sale. Similarly, two of Plaintiff Council of Imams in New Jersey's member mosques have experienced losses in donation or financial support from congregants which further financially harm both mosques' ability to fulfill their religious missions. Even my own self-esteem and confidence to earn income by resuming my teaching career in the public school system have been greatly

harmed by law enforcement surveillance due to my Muslim identity. Therefore, I should be entitled to compensatory, exemplary, punitive, and general damages of ten million dollars may reasonably and hopefully be deemed as just and fair by the jury and the court as well.

Complainant,

*mohammad ariff Saidin.*

Mohammad Ariff Saidin

639 Rosedale Avenue,

Apt. 1B,

Bronx, NY 10473

Phone: 347-918-1705

Email address: MohammadAriffSaidin@hotmail.com

Note: Enclosed herewith is a complete copy in *Hassan v. City of New York*, No. 14-1688 by the Third Circuit on Oct. 13, 2015 that emphatically overturned a New Jersey district court, which had dismissed a challenge to the New York City Police Department's Muslim surveillance program as a reference in support of my Amended Complaint above for this court.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 14-1688

———————

SYED FARHAJ HASSAN;
THE COUNCIL OF IMAMS IN NEW JERSEY;
MUSLIM STUDENTS ASSOCIATION OF THE U.S.
AND CANADA, INC.;
ALL BODY SHOP INSIDE & OUTSIDE;
UNITY BEEF SAUSAGE COMPANY;
MUSLIM FOUNDATION INC.; MOIZ MOHAMMED;
JANE DOE; SOOFIA TAHIR;
ZAIMAH ABDUR-RAHIM;
ABDUL-HAKIM ABDULLAH,

Appellants

v.

THE CITY OF NEW YORK

———————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 2-12-cv-03401)
District Judge: Honorable William J. Martini

———————

Argued January 13, 2015

Before: AMBRO, FUENTES, and ROTH, <u>Circuit Judges</u>

(Opinion filed:  October 13, 2015)

Baher A. Azmy, Esquire     (Argued)
Ghita Schwarz, Esquire
Omar Farah, Esquire
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY   10012

Glenn Katon, Esquire
Farhana Khera, Esquire
Adil Haq, Esquire
Muslim Advocates
P.O. Box 71080
Oakland, CA   94612

Lawrence S. Lustberg, Esquire
Joseph A. Pace, Esquire
Portia Dolores Pedro, Esquire
Gibbons
One Gateway Center
Newark, NJ   07102

       Counsel for Appellants

Zachary W. Carter
  Corporation Counsel of the City of New York
Richard P. Dearing, Esquire
Peter G. Farrell, Esquire     (Argued)

Celeste Koeleveld, Esquire
Alexis Leist, Esquire
Anthony DiSenso, Esquire
William Oates, Esquire
Cheryl Shammas, Esquire
Odile Farrell, Esquire
New York City Law Department
100 Church Street
New York, NY 10007

   Counsel for Appellee

Ayesha N. Khan, Esquire
Gregory M. Lipper, Esquire
Alexander J. Luchenitser, Esquire
Americans United for Separation of Church and State
1901 L Street N.W.
Suite 400
Washington, DC 20036

   Counsel for Amicus Appellant
   Americans United for Separation of Church and State

Benjamin C. Block, Esquire
William Murray, Esquire
Covington & Burling LLP
850 Tenth Street N.W.
Washington, DC 20001

Stephen J. Schulhofer, Esquire
40 Washington Square South
New York, NY 10012

Robert L. Rusky, Esquire
159 Beaver Street
San Francisco, CA  94114

> Counsel for Amicus Appellants
> Karen Korematsu, Jay Hirabayashi, Holly Yasui

Brian D. Boyle, Esquire
Walter E. Dellinger, III, Esquire
Deanna M. Rice, Esquire
Nausheen Hassan, Esquire
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC  20006

> Counsel for Amicus Appellants
> 100 Blacks in Law Enforcement Who Care,
> Chris Burbank, Eric Adams

Gregory J. Wallance, Esquire
W. Stewart Wallace, Esquire
Kaye Scholer LLP
250 West 55th Street
New York, NY   10019

Michael Robertson, Esquire
Kaye Scholer LLP
The McPherson Building
901 Fifteenth Street, N.W.
Washington, DC  20005-2327

> Counsel for Amicus Appellants
> Asian American Legal Defense and Education Fund,

American Arab Anti-Discrimination Committee,
Universal Muslim Association of America Advocacy,
South Asian Americans Leading Together,
Shia Rights Watch,
New Jersey Muslim Lawyers Association,
National Network for Arab American Communities,
National Lawyers Guild New York City Chapter,
Muslim Public Affairs Council,
Muslim Legal Fund of America,
Muslim Consultative Network,
Muslim Bar Association of New York,
Muslim American Civil Liberties Coalition,
Creating Law Enforcement Accountability and
Responsibility,
Arab American Association of New York,
Asian Americans Advancing Justice–Asian Law
Caucus,
South Asian Organization, Project SALAM

Ronald K. Chen, Esquire
Rutgers University Constitutional Rights Clinic
123 Washington Street
Newark, NJ   07102

Edward Barocas, Esquire
Jeanne LoCicero, Esquire
Alexander Shalom, Esquire
American Civil Liberties Union of New Jersey Foundation
P.O. Box 32159
Newark, NJ   07102

Counsel for Amicus Appellants
American Civil Liberties Union of New Jersey,

5

LatinoJustice PRLDEF,
Mexican American Legal Defense and Educational
Fund,
Bill of Rights Defense Committee, Garden State Bar,
Association, Hispanic Bar Association of New Jersey,
Association of Black Women Lawyers of New Jersey

Bruce D. Brown, Esquire
Gregg P. Leslie, Esquire
Jamie T. Schuman, Esquire
Reporters Committee for Freedom of the Press
1101 Wilson Boulevard, Suite 1100
Arlington, VA   22209

Jennifer A. Borg, Esquire
North Jersey Media Group Inc.
1 Garret Mountain Plaza
Woodland Park, NJ   07424

Counsel for Amicus Appellants
Reporters Committee for Freedom of the Press,
North Jersey Media Group Inc.

Michael W. Price, Esquire
Faiza Patel, Esquire
Brennan Center for Justice at NYU School of Law
161 Avenue of the Americas
New York, NY   10013

Counsel for Amicus Appellant
Brennan Center for Justice at New York University
School of Law

Allen P. Pegg, Esquire
Hogan Lovells US LLP
600 Brickell Avenue, Suite 2700
Miami, FL   33131

        Counsel for Amicus Appellants
        Sikh Coalition, Interfaith Alliance Foundation,
        National Council of the Churches of Christ in the
        USA,
        Union for Reform Judaism,
        Central Conference of American Rabbis,
        Women of Reform Judaism,
        Islamic Society of North America,
        Bend the Arc: A Jewish Partnership for Justice,
        Hindu Temple Society of North America,
        Auburn Theological Seminary,
        National Council of Jewish Women,
        Universal Muslim Association of America,
        American Humanist Association,
        Sikh American Legal Defense and Education Fund,
        Muslim Alliance in North America
        National Religious Campaign Against Torture,
        Reconstructionist Rabbinical Association,
        Imam Mahdi Association of Marjaeya,
        Muslims for Peace,
        T'ruah: The Rabbinic Call for Human Rights,
        Ta'leef Collective, Muslim Congress, Unitarian
        Universalist Legislative Ministry of New Jersey,
        Queens Federation of Churches, Inc.,
        Northern California Islamic Council,
        Council of Islamic Organization of Greater Chicago,
        Islamic Shura Council of Southern California

---

## OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

## **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................ 9

II. BACKGROUND ............................................................... 10

   A. Plaintiffs' Allegations ............................................... 10

     1.  The Program ...................................................... 10

     2.  Reports and Informational Databases ................... 13

     3.  Fall-Out from the Program's Disclosure to the
        Public ............................................................... 14

   B. District Court ........................................................... 17

III. STANDING ................................................................... 18

   A. Injury-in-Fact .......................................................... 19

   B. Fair Traceability ...................................................... 25

   C. Redressability ......................................................... 27

IV. CONSTITUTIONAL CLAIMS ....................................... 28

   A. Equal-Protection Claim ............................................ 28

     1.  Do Plaintiffs Plausibly Allege Intentional
        Discrimination? ................................................ 29

        i.   Plaintiffs Plausibly Allege a Surveillance
            Program with a Facially Religious
            Classification. ........................................... 29

ii   Intentional Discrimination Does Not Require an
Invidious Motive. ...........................................35

2.  Is the Alleged Discrimination Nonetheless Legally
Justified? ..................................................37

i.   Level of Scrutiny............................................37

ii.  Evaluation of Means and Ends.......................51

B. First-Amendment Claims ...........................................55

V. CONCLUSION.................................................................58

# I.   INTRODUCTION

Plaintiffs appeal the dismissal of their civil-rights suit
against the City of New York (the "City").  They claim to be
targets of a wide-ranging surveillance program that the New
York City Police Department (the "NYPD") began in the
wake of the September 11, 2001 terrorist attacks (the
"Program").  Plaintiffs allege that the Program is based on the
false and stigmatizing premise that Muslim religious identity
"is a permissible proxy for criminality, and that Muslim
individuals, businesses, and institutions can therefore be
subject to pervasive surveillance not visited upon individuals,
businesses, and institutions of any other religious faith or the
public at large."  First Am. Compl. ¶ 6 (the "Complaint" or
"Compl.").  They bring this lawsuit "to affirm the principle
that individuals may not be singled out for intrusive
investigation and pervasive surveillance that cause them
continuing harm simply because they profess a certain
faith."  *Id.* ¶ 8.

In its narrowest form, this appeal raises two questions:
Do   Plaintiffs—themselves   allegedly   subject   to   a

discriminatory surveillance program—have standing to sue in federal court to vindicate their religious-liberty and equal-protection rights?  If so, taking Plaintiffs' non-conclusory allegations as true, have they stated valid claims under the First and Fourteenth Amendments to our Constitution?  Both of these questions, which we answer yes, seem straightforward enough.  Lurking beneath the surface, however, are questions about equality, religious liberty, the role of courts in safeguarding our Constitution, and the protection of our civil liberties and rights equally during wartime and in peace.

## II.    BACKGROUND

### A.    Plaintiffs' Allegations

Lead Plaintiff Syed Faraj Hassan and others of or associated with the Islamic faith (collectively "Plaintiffs") assert that, since January 2002, the City has through the NYPD conducted the Program in secret "to monitor the lives of Muslims, their businesses, houses of worship, organizations, and schools in New York City and surrounding states, particularly New Jersey."  *See* Pls.' Br. 2 (citing Compl. ¶¶ 36, 38).  As this case comes before us on the City's Motion to Dismiss, we must take all facts alleged in Plaintiffs' Complaint as true and draw all reasonable inferences that arise therefrom in their favor. *See* Fed. R. Civ. P. 12(b)(6).

### 1.    The Program

Plaintiffs contend that the NYPD launched the Program following the September 11, 2001 terrorist attacks with the goal of "infiltra[ting] and monitor[ing] Muslim life in and around New York City." Compl. ¶ 2.  They claim that it "target[s] Muslim entities and individuals in New Jersey for

investigation solely because they are Muslim or believed to be Muslim" rather than "based upon evidence of wrongdoing." *Id.* ¶¶ 7, 47. Plaintiffs claim that the Program, going on its tenth year when the Complaint was filed, "has never generated a single lead." *Id.* ¶ 2.

Per the Complaint, the NYPD "uses a variety of methods to spy on Muslims." *Id.* ¶ 39. Among the techniques that it employs are to "snap pictures, take video, and collect license plate numbers of [mosque] congregants" and to "mount surveillance cameras on light poles, aimed at mosques," which "[o]fficers can [then] control [remotely] . . . with their computers" and which generate footage used "to help identify worshippers." *Id.* ¶ 46. Plaintiffs also allege the NYPD sends "undercover officers"—some of which are called "mosque crawlers" and "rakers"—into mosques, student organizations, businesses, and neighborhoods that "it believes to be heavily Muslim." *Id.* ¶¶ 47, 49–50. By "monitor[ing] sermons and conversations in mosques" and "surveil[ling] locations such as bookstores, bars, cafes, and nightclubs," officers "document[] . . . American Muslim life" in "painstaking detail[]" and "report back to the NYPD." *Id.* ¶ 47.

While Plaintiffs believe that some of this surveillance activity is passive (such as "tak[ing] video and photographs at mosques, Muslim-owned businesses, and schools," *id.* ¶ 39, and recording "the subject of conversations overheard at mosques," *id.* ¶ 47), in other cases NYPD officers more actively engage with the persons monitored. One alleged spying method of the latter type is to "sen[d] undercover officers to [Muslim-affiliated] locations to engage in pretextual conversations to elicit information from proprietors and patrons." *Id.* ¶ 39. Officers also "sometimes pose" as members of certain groups and organizations under investigation. *Id.* ¶ 50. The Complaint illustrates one such

example where an NYPD "officer . . . went on a rafting trip with a[] [Muslim Students Association (MSA)] and monitored and recorded how often the student participants on the trip prayed" and their "discuss[ion of] religious topics." *Id.*

Not only does the alleged Program "utilize[] numerous forms of surveillance," *id.* ¶ 45, but that surveillance is also widespread. Plaintiffs claim, for instance, that the NYPD "has strived to have an informant inside every mosque within a 250-mile radius of New York City" and has "place[d] informants or undercover officers in all or virtually all MSAs" at "colleges and universities in New York, New Jersey, Connecticut, and Pennsylvania . . . without any indication whatsoever of criminal activity or any connection whatsoever to wrongdoing." *Id.* ¶¶ 47, 49. In all, the NYPD has allegedly "surveill[ed] . . . at least twenty mosques, fourteen restaurants, eleven retail stores, two grade schools and two [MSAs], in addition to an untold number of individuals who own, operate, and visit those establishments." *Id.* ¶ 3.

Plaintiffs claim that, in addition to singling out organizations and businesses for surveillance that in some way are visibly or openly affiliated with Islam (such as mosques or businesses with prayer mats or other Islamic identifications), "the Program also intentionally targets Muslims by using ethnicity as a proxy for faith." *Id.* ¶ 40. Plaintiffs aver, for instance, that the NYPD "has designated twenty-eight countries . . . constitut[ing] about 80% of the world's Muslim population" and "American Black Muslim" as "ancestries of interest." *Id.* ¶ 41. But the Program is still decidedly focused on religion. Thus, rather than "surveil all people and establishments with 'ancestries of interest,'" the NYPD "expressly chooses to exclude people and establishments with such 'ancestries' if they are not Muslim."

*Id.* ¶ 42.   This includes "Egyptians if they are Coptic Christians, Syrians if they are Jewish, or Albanians if they are Catholic or Orthodox Christian." *Id.*   Conversely, Plaintiffs claim that the NYPD has examined other immigrant communities in Newark, New Jersey "for the presence of Muslims," such as the "Portuguese and Brazilian immigrant communities" notwithstanding that "Portugal and Brazil [are] . . . not found on [the NYPD's] list of twenty-eight 'ancestries.'" *Id.* ¶ 44.

### 2.   *Reports and Informational Databases*

Plaintiffs allege that the Program has resulted in "a series of reports documenting in detail the information obtained from [the NYPD's] surveillance of New Jersey Muslim communities." *Id.* ¶ 5.   These "includ[e] a report focusing on the Muslim community in Newark" (the "Newark report"), *id.*; "more than twenty precinct-level maps of the City of Newark, noting the location of mosques and Muslim businesses and the ethnic composition of the Muslim community," *id.* ¶ 3; "analytical report[s] on every mosque within 100 miles" of New York City, *id.* ¶ 47; and a weekly "MSA Report on schools, including reports on Rutgers New Brunswick and Rutgers Newark," *id.* ¶ 51.

The information and records collected and compiled are extensive and varied.   Among these are "pictures, . . . video, . . . and license plate numbers of [mosque] congregants," *id.* ¶ 46; intelligence about "where religious schools are located," *id.* ¶ 47; indications of religious affiliation and Muslim patronage of shops, restaurants, and grocery stores, *id.*; lists of "businesses owned or frequented by Muslims," *id.*; and "names of professors, scholars, and students" affiliated with MSAs, *id.* ¶ 51.   The City also allegedly "compiles databases of new Muslim converts who take Arabic names, as well as Muslims who

take names that are perceived to be 'Western.'" *Id.* ¶ 55.

Besides names and other identifying information of individuals, businesses, and organizations, the NYPD reports include seemingly mundane and innocuous details about Muslim community life in New Jersey, such as: (1) "flyers are posted in shops advertising for Quran tutoring;" (2) "a picture of a mosque hangs in a grocery store;" (3) "a restaurant serves 'religious Muslims;'" (4) "customers visit a Dunkin' Donuts after Friday prayer;" (5) "a restaurant is located near a particular mosque;" (6) "employees or customers of establishments are observed wearing 'traditional clothing;'" (7) "Muslim prayer mats are hanging on the wall at an Indian restaurant;" and (8) "a store posts a sign that it will be closed on Friday in observance of Friday prayer." *Id.* ¶ 47. Finally, NYPD officers have compiled "the subject[s and details] of conversations overheard at mosques." *Id.* In one 2006 report, for instance, they "document[ed] twenty-three conversations at twenty mosques," though "[n]one of the information collected showed any indication of criminal activity." *Id.*

### 3.     *Fall-Out from the Program's Disclosure to the Public*

Plaintiffs claim that, despite "initial secrecy," public knowledge of the alleged Program's existence "has become widespread in New Jersey and elsewhere." *Id.* ¶ 45. They also contend that a number of the allegedly generated reports "ha[ve] been widely publicized," *id.* ¶ 20, and that each Plaintiff has been "either specifically named in an NYPD spying report or is a member of at least one mosque or other association named in such a report," Pls.' Br. 21 (citing Compl. ¶¶ 12–15, 17–26, 28–29, 31–32, 34).

Plaintiffs have learned since the news broke, for

instance, that the NYPD's so-called "Newark report" designates several of them as a "Location of Concern," defined "as, among other things, a 'location that individuals may find co-conspirators for illegal actions,' and a 'location that has demonstrated a significant pattern of illegal activities.'" Compl. ¶ 58. Similarly, the NYPD's "U.S.–Iran report" describes organizations believed to pose serious threats to New York City, such as Hezbollah and Hamas, along with a list of "Other Shi'a Locations in the vicinity of NYC," which include Plaintiff Muslim Foundation Inc. ("MFI") and Masjid-e-Ali mosque (owned and operated by MFI), "as well as three additional mosques attended by Plaintiff Hassan." *Id.* ¶ 60.

While Plaintiffs allege that the Program is stigmatizing by itself, they also claim these specific defamatory statements targeting them in particular have intensified their harms and that "New York City officials" have exacerbated these injuries by publicly "acknowledg[ing] the [Program's] existence" and "describing it as focused on 'threats' and as an attempt to document the 'likely whereabouts of terrorists.'" *Id.* ¶ 61. "Discussing the surveillance, [former] Mayor Bloomberg has stated publicly" that "[w]e're doing the right thing. We will continue to do the right thing." *Id.* ¶ 64. And "[former Police] Commissioner Kelly has said" that "[w]e're going to continue to do what we have to do to protect the [C]ity." *Id.* Plaintiffs state that these and other "official proclamations," which "falsely suggest that Muslims alone present a unique law enforcement threat," indicate "that [City officials] believe the NYPD's targeting of Muslims for surveillance on the basis of their religion is appropriate and will continue." *Id.* ¶¶ 64–65.

Plaintiffs also contend that, in large part because of the Program's alleged stigmatizing and reputational consequences, the surveillance has affected their worship and

religious activities. For example, Plaintiff Hassan, a soldier
in the U.S. Army who has worked in military intelligence,
asserts that "[h]e has decreased his mosque attendance
significantly" because of his belief that "being closely
affiliated with mosques under surveillance by law
enforcement" will jeopardize his ability to hold a security
clearance and will tarnish his reputation among his fellow
soldiers and diminish their trust in him. *Id.* ¶¶ 11–13.
Likewise, Plaintiffs Moiz Mohammed, Jane Doe, and Soofia
Tahir state that they now avoid (or have avoided) discussing
their faith openly or at MSA meetings for fear of being
watched and documented, *id.* ¶¶ 24–30, and Plaintiff
Mohammad alleges that "[t]he stigma now attached to being a
Muslim member of the MSA has caused [him] to avoid
discussing his faith or his MSA participation in public and to
avoid praying in places where non-Muslims might see him
doing so," *id.* ¶ 25.

The individual Plaintiffs are not the only ones affected.
The organizational Plaintiffs allege that the Program "has
undermined their ability to fulfill their mission[s by] deterring
potential members from joining and casting doubt on [their]
ability to maintain the confidentiality of their membership."
Pls.' Br. 6 (citing Compl. ¶ 17). According to the Complaint,
two mosques that are members of Plaintiff Council of Imams
in New Jersey, and that are named in the NYPD's Newark
report, "have . . . seen a decline in attendance . . . as a result
of the [NYPD's] surveillance" because their congregants can
no longer worship freely knowing that law-enforcement
agents or informants are likely in their midst. Compl. ¶ 15.
Similarly, "[a]s affinity student groups, MSAs subject to
surveillance . . . are diminished in their ability to establish
viable student organizations that students will feel secure
joining and participating in" and are less able "to embark
upon integral partnerships with campus administrators and
other organizations and [to] fulfill the spiritual needs of their

16

members in a confidential manner." *Id.* ¶ 17. And Plaintiff MFI has changed its religious and educational programming to avoid controversial topics likely to stigmatize its membership further and to attract additional NYPD attention. *Id.* ¶ 23.

Finally, several Plaintiffs also contend that financial harm has accompanied their alleged religious, reputational, and stigmatizing injuries. For example, Plaintiffs All Shop Body Inside & Outside and Unity Beef Sausage Company claim that the surveillance has damaged their "business[es] by scaring away customers," *id.* ¶¶ 19, 21, and Plaintiffs Zaimah Abdur-Rahim and Abdul-Hakim Abdullah allege that the publication of the address and a photograph on the Internet of their home "in connection with the NYPD's surveillance . . . has decreased [its] value . . . and diminished [its] prospects for sale," *id.* ¶¶ 31–32, 34. Also, two of Plaintiff Council of Imams in New Jersey's member mosques have witnessed "[l]osses in . . . financial support," which further "harm[s] both mosques' ability to fulfill their religious missions." *Id.* ¶ 15.

### B.    District Court

In June 2012, Plaintiffs sued the City pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), for discriminating against them as Muslims in violation of the Free Exercise and Establishment Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. They seek expungement of any unlawfully obtained records pertaining to them, a judgment declaring that the City has violated their First and Fourteenth Amendment rights, an order enjoining their future discriminatory surveillance, and damages.

The District Court granted the City's Motion to

17

Dismiss the Complaint in February 2014 pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of standing and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. First, the Court held that Plaintiffs failed to identify any cognizable "injury-in-fact" (let alone one "fairly traceable" to the City's surveillance). Second, it concluded that Plaintiffs failed to state a claim because "[t]he more likely explanation for the surveillance was a desire to locate budding terrorist conspiracies" than a desire to discriminate. *Hassan v. City of New York*, No. 12-cv-3401, 2014 WL 654604, at *7 (D.N.J. Feb. 20, 2014). It therefore entered judgment in the City's favor. Plaintiffs now appeal these rulings.

## III.   STANDING

As did the District Court, we begin with Plaintiffs' standing to have a federal court decide their claims. Standing to sue is required for jurisdiction in a federal forum. Derived from Article III of our Constitution, it is the threshold inquiry in every case, one for which "[t]he party invoking federal jurisdiction bears the burden of [proof]." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Analyzing this requirement entails a three-part inquiry. Has at least one plaintiff suffered an "injury in fact"? *Id.* If so, is that injury "fairly . . . trace[able] to the challenged action of the defendant"? *Id.* at 560 (alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). And if the answer to both is yes, will that injury be "likely . . . redressed by a favorable decision"? *Id.* at 561 (quoting *Simon*, 426 U.S. at 38).

When answering these questions, "we must assume that the party asserting federal jurisdiction is correct on the legal merits of his claim, that a decision on the merits would be favorable[,] and that the requested relief would be

granted." *Cutler v. U.S. Dep't of Health & Human Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015) (internal quotation marks omitted). In other words, to withstand a "facial attack" at the motion-to-dismiss stage, a plaintiff need only plausibly allege facts establishing each constitutional requirement. *Lewis v. Casey*, 518 U.S. 343, 358 (1996).

## A.    Injury-in-Fact

A plaintiff alleges injury-in-fact when it claims that it has, or is in imminent danger of having, suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "'actual or imminent, not conjectural and hypothetical.'" *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)) (internal quotation marks omitted). The burden is low, requiring nothing more than "'an identifiable trifle' of harm." *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 177 (3d Cir. 2001) (Alito, J.) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 686 (1973)).

While Plaintiffs point to at least four other injuries they contend also meet this requirement, "[t]he indignity of being singled out [by a government] for special burdens on the basis of one's religious calling," *Locke v. Davey*, 540 U.S. 712, 731 (2004) (Scalia, J., dissenting), is enough to get in the courthouse door. Unequal treatment is "a type of personal injury [that] ha[s] long [been] recognized as judicially cognizable," *Heckler v. Mathews*, 465 U.S. 728, 738 (1984), and virtually every circuit court has reaffirmed[1]—as has the

---

[1] *See, e.g., Davis v. Guam*, 785 F.3d 1311, 1315 (9th Cir. 2015) ("[E]qual treatment under law is a judicially cognizable interest . . . even if it brings no tangible benefit to the party

Supreme Court—that a "discriminatory classification is itself a penalty," *Saenz v. Roe*, 526 U.S. 489, 505 (1999), and thus qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is at stake. *See also Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 657 (1993) ("The 'injury in fact' . . . is the denial of equal treatment . . . .").[2]

---

asserting it."); *Am. Civil Liberties Union of N.M. v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008) ("The injury in fact is the denial of equal treatment."); *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004) ("Discriminatory treatment . . . qualif[ies] as an actual injury for standing purposes."); *Lutheran Church-Mo. Synod v. FCC*, 154 F.3d 487, 493 (D.C. Cir. 1998) ("[T]he claim that the litigant was denied equal treatment is sufficient to constitute Article III 'injury in-fact.'"); *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1214 n.2 (5th Cir. 1991) ("[I]llegitimate unequal treatment is an injury unto itself . . . .").

[2] Plaintiffs' personal interest in religious equality falls squarely within the zone of those protected by the constitutional guarantees in question. While their claims certainly strike at the heart of the Equal Protection Clause of the Fourteenth Amendment, the First Amendment's guarantee of freedom of religion includes freedom from religious discrimination. *See, e.g., Permoli v. Municipality No. 1 of New Orleans*, 44 U.S. 589, 597 (1845) ("Equality before the law is of the very essence of liberty, whether civil or religious."); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008) (McConnell, J.) ("From the beginning,

20

None of the City's arguments to the contrary are persuasive. First, its argument that unequal treatment is only injurious when it involves a tangible benefit like college admission or Social Security takes too cramped a view of Article III's injury requirement. As the Supreme Court has noted,

> discrimination itself, by perpetuating "archaic and stereotypic notions" or by stigmatizing members of the disfavored group as "innately inferior" and therefore as less worthy participants in the political community, can cause serious noneconomic injuries to those

this nation's conception of religious liberty included, at a minimum, the equal treatment of all religious faiths without discrimination or preference."); *cf.* Karl Loewenstein, *Some General Observations on the Proposed "International Bill of Rights"* 17 (1942).

"[T]he Religion Clauses . . . and the Equal Protection Clause as applied to religion . . . all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring in part and concurring in the judgment in part); *see also, e.g., Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 845 (1995); *Larson v. Valente*, 456 U.S. 228, 244–45 (1982); *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 792–93 (1973); *Gillette v. United States*, 401 U.S. 437, 449 (1971); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947).

persons who are personally denied equal
treatment solely because of their membership in
a disfavored group.

*Heckler*, 465 U.S. at 739–40 (citation omitted) (quoting *Miss.
Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982)); *see
also, e.g., Mardell v. Harleysville Life Ins. Co.*, 65 F.3d 1072,
1074 (3d Cir. 1995) (*per curiam*) ("[A] victim of
discrimination suffers a dehumanizing injury as real as, and
often of far more severe and lasting harm than, a blow to the
jaw." (internal quotation marks omitted)). After all, "[t]he
fundamental concern of discrimination law is to redress the
dignitary affront that decisions based on group characteristics
represent, not to guarantee specific economic expectancies."
*Sandberg v. KPMG Peat Marwick, L.L.P.*, 111 F.3d 331, 335
(2d Cir. 1997).

The City next argues that Plaintiffs have suffered no
injury-in-fact because it has not overtly condemned the
Muslim religion. City Br. 35. This argument does not stand
the test of time. Our Nation's history teaches the
uncomfortable lesson that those not on discrimination's
receiving end can all too easily gloss over the "badge of
inferiority" inflicted by unequal treatment itself. Closing our
eyes to the real and ascertainable harms of discrimination
inevitably leads to morning-after regret. *Compare Plessy v.
Ferguson*, 163 U.S. 537, 551 (1896) ("[If] enforced
separation of the two races stamps the colored race with a
badge of inferiority . . . [,] it is not by reason of anything
found in the act, but solely because the colored race chooses
to put that construction upon it."), *with Brown v. Bd. of Educ.*,
347 U.S. 483, 494 (1954) ("To separate [children] from
others of similar age and qualifications solely because of their
race generates a feeling of inferiority as to their status in the
community that may affect their hearts and minds in a way
unlikely ever to be undone.").

22

Moving on, we are similarly unpersuaded by the City's alternative argument that Plaintiffs' alleged injuries are not "particularized." It is true that "only . . . a complainant [who] possesses something more than a general interest in the proper execution of the laws . . . is in a position to secure judicial intervention." *Stark v. Wickard*, 321 U.S. 288, 304 (1944). But where a plaintiff is "asserting [his or her] own [equality] right," a claim of discrimination, even where it affects a broad class, "is not an abstract concern or 'generalized grievance.'" *Ad Hoc Comm. of Concerned Teachers v. Greenburgh #11 Union Free Sch. Dist.*, 873 F.2d 25, 29 (2d Cir. 1989) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Because Plaintiffs in this case claim to be the very targets of the allegedly unconstitutional surveillance, they are unquestionably "affect[ed] . . . in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

Further, that hundreds or thousands (or even millions) of other persons may have suffered the same injury does not change the individualized nature of the asserted rights and interests at stake. *See, e.g.*, *Sch. Dist. v. Schempp*, 374 U.S. 203, 223 (1963) (calling religious freedom an "individual" right); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995) (referring to a citizen's "*personal* right to equal protection of the laws" (emphasis in original)). Standing is easily recognized, for instance, in the case of "a widespread mass tort," even though "large numbers of individuals suffer the same common-law injury." *FEC v. Akins*, 524 U.S. 11, 24 (1998). And for good reason: "[t]o deny standing to persons who are in fact injured[,] simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *Massachusetts v. EPA*, 549 U.S. 497, 526 n.24 (2007) (emphasis omitted) (quoting *SCRAP*, 412 U.S. at 688). Harm to all—even in the nuanced world of standing law—cannot be logically equated with harm to no one.

23

Against this background, the City's reliance on *Laird v. Tatum*, 408 U.S. 1 (1972), is misplaced. The plaintiffs there alleged only a "chilling effect" on third parties' speech caused by "the mere existence, without more, of [non-discriminatory] governmental investigative and data-gathering activity." *Id.* at 10–11. Plaintiffs here, by contrast, allege that the discriminatory manner by which the Program is administered itself causes them direct, ongoing, and immediate harm. Because "standing . . . is only a problem where no harm independent of the First Amendment is alleged," *Gill v. Pidlypchak*, 389 F.3d 379, 383 (2d Cir. 2004) (Calabresi, J.), and *Laird* doesn't stand for the proposition that public surveillance is either *per se* immune from constitutional attack or subject to a heightened requirement of injury, that case's "narrow" holding, *see* 408 U.S. at 15, doesn't reach the facts of this case.

Indeed, in several post-*Laird* cases we have recognized that, while surveillance in public places may not of itself violate any privacy right,[3] it can still violate other rights that give rise to cognizable harms. *See, e.g.*, *Hall v. Pa. State Police*, 570 F.2d 86, 91 (3d Cir. 1978) ("Although it may be assumed that the state may arrange for photographing all suspicious persons entering the bank, it does not follow that its criterion for selection may be racially based, in the absence of a proven compelling state interest." (citation omitted)); *cf. Anderson v. Davila*, 125 F.3d 148, 160–61 (3d Cir. 1997) (Roth, J.) (while public governmental surveillance alone was not cognizable, identical surveillance conducted in retaliation

---

[3] We do not take a position on whether Plaintiffs could have brought suit to vindicate such an interest. They do not allege a violation of some constitutional right to privacy, but to equal treatment.

24

for one's exercise of First Amendment rights gave rise to a separate injury cognizable under Article III).

## B.    Fair Traceability

The second requirement of injury-in-fact is a causal connection between a defendant's alleged conduct and the plaintiff's harm. *See Lujan*, 504 U.S. at 561.  The City contends that Plaintiffs have failed to satisfy this requirement because the Associated Press ("AP"), not the NYPD, revealed the Program to the public and did so without the City's permission.  In short, it argues, "What you don't know can't hurt you.  And, if you *do* know, don't shoot us.  Shoot the messenger."

Aside from its distortions of the factual record,[4] the

---

[4] Far from attesting to the NYPD and AP's respective roles in revealing the once-secret Program, the affidavit of defense counsel on which the City relies merely states that the AP reported on the NYPD's conduct and "released [unredacted] documents to the public at large beginning in . . . August 2011."  Decl. of Peter G. Farrell ¶ 3.  It is impossible to infer reasonably, let alone conclude, from this statement that the AP was the first (or only) public source of the information or that the NYPD played no role for which it may be held legally responsible.

Moreover, even if they were required to do so, Plaintiffs have produced ample evidence in rebuttal showing that: (1) "[a] former NYPD informant . . . independently [of the AP] revealed the NYPD's practice of targeting innocent Muslims" by "sp[eaking] publicly in great detail about his part in the NYPD's policy and practice of surveilling Muslims on the basis of religion," Decl. of Glenn Katon ¶ 4;

City's argument is legally untenable because (to repeat) the discrimination itself is the legally cognizable injury. Indeed, discrimination often has been likened to a "dignitary tort," *see, e.g., Curtis v. Loether*, 415 U.S. 189, 195 n.10 (1974) (quoting Charles O. Gregory & Harry Kalven, Jr., *Cases and Materials on Torts* 961 (2d ed. 1969)), where "[t]he tort is said to be damage itself," 2 Dan B. Dobbs, *Dobbs Law of Remedies* § 7.4(1), at 334 (2d ed. 1993). And, as with other "torts" in this category, "the affront to the other's dignity . . . is as keenly felt by one who only knows after the event that an indignity has been perpetrated upon him as by one who is conscious of it while it is being perpetrated." *Restatement (First) of Torts* § 18 cmt. e (1934). Because we view the claimed discrimination itself as the primary injury alleged, it "follows from our definition of 'injury in fact'" that the City "is the 'cause'" of that injury rather than any member of the press. *Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 666 n.5.

Finally, even if only the collateral consequences of the discrimination—rather than the unequal treatment itself—could count as Article III injury, the City "wrongly equat[es] . . . injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014) (second alteration in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)). That is incorrect. "[T]here is room for concurrent

---

and (2) "[s]ince the AP began publishing reports regarding the NYPD's policy and practice of targeting Muslims for surveillance, senior New York City officials have acknowledged and endorsed the NYPD's tactics," thus "propagat[ing] and amplif[ying] the harm," *id.* ¶ 3.

26

causation in the analysis of standing, and, indeed, 'an indirect causal relationship will suffice, so long as there is a fairly traceable connection.'" *Id.* (citation omitted) (quoting *Toll Bros. v. Township of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) (internal quotation marks omitted)); *see also Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.) ("[T]he question of core, constitutional injury-in-fact . . . requires no more than *de facto* causality."); *Pitt News v. Fisher*, 215 F.3d 354, 361 (3d Cir. 2000) ("but for" causation sufficient to establish traceability to establish standing).

## C.    Redressability

The last requirement of Article III standing is redressability, which requires the plaintiff to show that "it . . . [is] 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560 (quoting *Simon*, 426 U.S. at 38). Redressability is "easily established in a case where," as here, "the alleged injury arises from an identifiable discriminatory policy." *Smith v. Meese*, 821 F.2d 1484, 1494 (11th Cir. 1987). While we cannot predict "the exact nature of the possible relief . . . without a full development of the facts, an order enjoining the policy and requiring non-discriminatory investigation and enforcement would redress the injury." *Id.*

As for past harms, the potential avenues for redress depend on how a particular plaintiff's injury shows itself. Those plaintiffs able to prove "actual injur[ies]"—*i.e.*, those other than "the abstract value of [the] constitutional right[s]," such as out-of-pocket losses or emotional distress—may recover compensatory damages. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986); *see also Carey v. Piphus*, 435 U.S. 247, 264–66 (1978). For other plaintiffs, "the major purpose of the suit may be to obtain a public

declaration that the[y are] right and w[ere] improperly treated," *see Restatement (Second) of Torts* § 901 cmt. c (1979), along with nominal damages that serve as "a symbolic vindication of [their] constitutional right[s]," *Schneider v. County of San Diego*, 285 F.3d 784, 794 (9th Cir. 2002) (quoting *Floyd v. Laws*, 929 F.2d 1390, 1403 (9th Cir. 1991)). Given the range of available remedies, redressability is easily satisfied.

*     *     *     *     *

Confident in our jurisdiction to hear this case, we now turn to the merits of Plaintiffs' constitutional claims and begin with equal protection.

## IV.    CONSTITUTIONAL CLAIMS

### A.    Equal-Protection Claim

The Equal Protection Clause of the Fourteenth Amendment to our Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. Plaintiffs claim the City is contravening that mandate and violating their rights by surveilling them pursuant to a Program that investigates persons not because of any reasonable suspicion of wrongdoing (or other neutral criterion) but solely because of their Muslim religious affiliation.

A "claim of selective investigation" by the police draws on "'ordinary equal protection standards.'" *Flowers v. City of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). As with other equal-protection claims, we ask whether the City intentionally discriminates against a reasonably

28

identifiable group and whether that intentional discrimination is nonetheless legally justified.

### 1.  *Do Plaintiffs Plausibly Allege Intentional Discrimination?*

To state an equal-protection claim, Plaintiffs must allege (and ultimately prove) "intentional discrimination." *Washington v. Davis*, 426 U.S. 229, 241 (1976); *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 276 (1979). It is not enough for them to allege that they are Muslim and that the NYPD surveilled more Muslims than members of any other religion. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Rather, Plaintiffs' religious affiliation must have been a substantial factor in that different treatment. *Davis*, 426 U.S. at 235; *Feeney*, 442 U.S. at 276.

#### i.  Plaintiffs Plausibly Allege a Surveillance Program with a Facially Religious Classification.

There are a variety of theories to consider in an equal-protection claim of this type. First, Plaintiffs could point to a policy that is facially discriminatory, meaning that the policy "by its own terms" singles out Muslims "for different treatment." 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 18.4 (10th ed. 2012); *see, e.g., Adarand*, 515 U.S. at 213, 227–29. Second, they could identify a policy that "either shows no classification on its face or else indicates a classification which seems to be legitimate," yet one that NYPD officers apply to Muslims with a greater "degree[] of severity" than other religious groups. Rotunda & Novak, *supra*, § 18.4; *see, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886). Or, third, Plaintiffs could identify a facially neutral policy that the City purposefully "designed to impose different burdens" on

Muslims and that (even if applied evenhandedly) does in fact have the intended adverse effect. Rotunda & Novak, *supra*, § 18.4; *see, e.g., Village of Arlington Heights v. Met. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977).

Here, Plaintiffs seek to proceed by way of the first of these three methods, arguing their "allegations leave no doubt that the . . . [Program] relies on an express classification of Muslims for disfavored treatment." *See* Pls.' Br. 10. This is a viable legal theory. Where a plaintiff can point to a facially discriminatory policy, "the protected trait by definition plays a role in the decision-making process, inasmuch as the policy explicitly classifies people on that basis."[5] *Cmty. Servs. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005) (quoting *DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 726 (3d Cir. 1995)). Put another way, direct evidence of intent is "supplied by the policy itself." *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 128 (3d Cir. 1983) (Sloviter, J., dissenting).

---

[5] To the extent the City focuses on Plaintiffs' failure to allege the existence of a written policy, there is no requirement that a policy be reduced to written form. *See, e.g., Johnson v. California*, 543 U.S. 499, 502, 509 (2005) (holding that an "unwritten [prison] policy of racially segregating prisoners in double cells" was subject to strict scrutiny). As the Ninth Circuit has explained, "[t]he primary—indeed, perhaps only—difference [between a suit involving a written and unwritten policy] is an evidentiary one." *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011). While a "[p]laintiff[] ha[s] no difficulty establishing what a policy is when the policy is written," "[a]n unwritten policy, by contrast, is usually harder to establish." *Id.*

The City nonetheless attacks the plausibility of the allegations, arguing that Plaintiffs point to only "conclusory allegations . . . spread throughout [the] . . . [C]omplaint," which "as a matter of law cannot be credited." City Br. 56. It further asserts that, "[o]nce the conclusory allegations are pushed aside, the remaining factual allegations are insufficient to find a facially discriminatory classification." *Id.*

We disagree with this characterization. While the City compares Plaintiffs' claims to the conclusory allegations in *Iqbal*, those were far from what we have here. In our case, Plaintiffs allege specifics about the Program, including *when* it was conceived (January 2002), *where* the City implemented it (in the New York Metropolitan area with a focus on New Jersey), and *why* it has been employed (because of the belief "that Muslim religious identity . . . is a permissible proxy for criminality," Compl. ¶ 36). The Complaint also articulates the "variety of methods" by which the surveillance is carried out. *See, e.g., id.* ¶ 39 ("tak[ing] videos and photographs at mosques, Muslim-owned businesses and schools"); *id.* ("monitor[ing Muslim] websites, listservs, and chat rooms"); *id.* ¶ 46 ("snap[ping] pictures, tak[ing] video, and collect[ing] license plate numbers of congregants as they arrive at mosques to pray"); *id.* ¶ 47 ("us[ing] undercover officers . . . to monitor daily life in [Muslim] neighborhoods . . . and sermons and conversations in mosques"); *id.* ¶ 49 ("plac[ing] informants or undercover officers in all or virtually all MSAs"). These allegations are hardly "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Iqbal*, 556 U.S. at 681 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. at 544, 545 (2007)).

Despite the City's demand for more information about when, by whom, and how the policy was enacted and where it

was written down, "the *Twombly–Iqbal* duo have *not* inaugurated an era of evidentiary pleading." *Santana v. Cook Cnty. Bd. of Review*, 270 F.R.D. 388, 390 (N.D. Ill. 2010) (emphasis in original); *see also Twombly*, 550 U.S. at 570 (rejecting the proposition that notice pleading "require[s] heightened fact pleading of specifics"). Nor do "factual allegations . . . become impermissible labels and conclusions simply because the additional factual allegations explaining and supporting the articulated factual allegations are not also included." *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753 (E.D. Pa. 2014) (internal quotation marks omitted). While it is possible that Plaintiffs will ultimately falter in meeting their burden of proof, the collection of evidence is the object of discovery.

Moreover, even if the pleading of "evidence" rather than "grounds for relief" were required (which it is not), the Complaint includes numerous examples of persons that the NYPD is surveilling because of their religious affiliation.[6]

---

[6] To the extent the City means to argue that Plaintiffs have failed to allege plausibly that even these exemplars have not been singled out by reason of their religious affiliation, we disagree. Plaintiffs' allegations, which draw on the sources of circumstantial evidence commonly used to make out a *prima facie* case of intentional discrimination in a disparate-treatment suit of this type, easily satisfy the plausibility threshold required to survive a motion to dismiss. *See, e.g., Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 410 (2d Cir. 1990) ("maintenance of records of the race of the arrestees"); *Marshall v. Colum. Lea Reg'l Hosp.*, 345 F.3d 1157, 1170 (10th Cir. 2003) (McConnell, J.) (racial designation on a driving-citation form "where none was

*See, e.g.*, Compl. ¶ 14 (the Masjid al-Haqq and Masjid Ali K. Muslim mosques); *id.* ¶ 17 (MSAs for Rutgers University campuses at Newark and New Brunswick); *id.* ¶ 18 (All Body Shop Inside & Outside); *id.* ¶ 20 (Unity Beef Sausage Co.); *id.* ¶ 22 (the Masjid-e-Ali mosque); *id.* ¶ 31 (Al-Hidaayah Academy); *id.* (Al Muslimaat Academy). These allegations supplement those that the NYPD "surveil[led] . . . at least twenty mosques, fourteen restaurants, eleven retail stores, two grade schools and two [MSAs] in New Jersey," *id.* ¶ 38; "creat[ed] over twenty precinct-level maps of the City of Newark," *id.*; and attempted to place an "informant inside every mosque within a 250-mile radius of New York City" as well as prepared an "analytical report on every mosque within 100 miles," *id.* ¶ 47.

Finally, because Plaintiffs allege that all of these persons and entities were surveilled without any reasonable suspicion of wrongdoing (as noted above, they assert that, "[i]n all its years of operation, the Program has never generated a single [criminal] lead," *id.* ¶ 2), this case can be easily contrasted with others where the law-enforcement investigation at issue was almost certainly explained by a reasonable suspicion of wrongdoing.[7]  *Cf. George v. Rehiel*,

---

called for"); *Jean v. Nelson*, 711 F.2d 1455, 1495–96 (11th Cir. 1983) (statistical evidence showing "glaring" effect on protected class); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 587 (S.D.N.Y. 2013) (disparities between minority groups in "hit rates" combined with other evidence); *Rodriguez v. Cal. Highway Patrol*, 89 F. Supp. 2d 1131, 1141 (N.D. Cal. 2000) (statistical evidence).

[7] This of course is not to say that an absence or presence of reasonable suspicion in a particular case determines the

33

738 F.3d 562, 586 (3d Cir. 2013) ("The TSA Officials' suspicion was an obvious alternative explanation for their conduct, which negates any inference of retaliation."). That we might be able to conjure up some non-discriminatory motive to explain the City's alleged conduct is not a valid basis for dismissal. It is "only when [a] defendant's plausible

viability of a plaintiff's equal-protection claim. *Cf. Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Scopo*, 19 F.3d 777, 786 (2d Cir. 1994) (Newman, C.J., concurring) ("Though the Fourth Amendment permits a pretext arrest, if otherwise supported by probable cause, the Equal Protection Clause still imposes restraint on impermissibly class-based discriminations.").

But although a lack of reasonable suspicion does not afford a presumption that a law-enforcement officer initiated an investigation on the basis of a protected characteristic, it is certainly one factor that may be considered by a finder of fact. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 822 n.1 (6th Cir. 2005) ("While the stop was justified from a Fourth Amendment perspective . . . [,] the lack of suspicion . . . may properly be considered in the plaintiffs' selective-enforcement claim."); *Anderson v. Cornejo*, 284 F. Supp. 2d 1008, 1055 (N.D. Ill. 2003) (citing "the lack of adequate suspicion for a strip search" as probative of the fact that a customs officer "acted, at least in part, because [the plaintiff was] an African-American woman").

34

alternative explanation is so convincing" to render the "plaintiff's explanation . . . *im*plausible" that a court may dismiss a complaint. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (emphasis in original).

In sum, because Plaintiffs have pleaded ample "factual content [that] allows [us] to draw the reasonable inference that the [City] is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 663, we decline to dismiss their Complaint on the ground that they have not plausibly alleged a surveillance program with a facially discriminatory classification.

ii     Intentional Discrimination Does Not Require an Invidious Motive.

The City also argues that, even assuming Plaintiffs have plausibly alleged a facial classification based on religious affiliation, their allegations of discriminatory "purpose" are implausible because "the more likely explanation for the NYPD's actions is public safety rather than discrimination based upon religion." City Br. 49. Its reasoning is essentially two-fold: "the surveillance is alleged to have begun just after the [September 11, 2001] terrorist attacks," *id.*, and "[t]he police could not have monitored New Jersey for Muslim terrorist activities without monitoring the Muslim community itself," *id.* (alteration in original) (quoting *Hassan*, 2014 WL 654604, at *6).

Here's the City's problem: there's a difference between "intent" and "motive."   "[A] defendant acts intentionally when he desires a particular result, without reference to the reason for such desire. Motive, on the other hand, is the reason why the defendant desires the result." 2 Harry Sanger Richards et al., *American Law and Procedure* § 8, at 6 (1922).   In other words, "intent" asks whether a person acts "intentionally or accidentally," while "motive"

asks, "If he did it intentionally, *why* did he do it?"  1 John William Salmond, *Jurisprudence* § 134, at 398 (7th ed. 1924) (emphasis in original); *see also Black's Law Dictionary* 881 (Bryan Garner ed., 10th ed. 2014) ("While motive is the inducement to do some act, intent is the mental resolution or determination to do it.").  This fundamental "distinction between motive and intent runs all through the law." *Johnson v. Phelan*, 69 F.3d 144, 155 (7th Cir. 1995) (Posner, C.J., concurring in part and dissenting in part).

In focusing on what the City contends was its "legitimate purpose[]" of "analy[zing] . . . potential [security] threats and vulnerabilities," City Br. 50, it wrongly assumes that invidious motive is a necessary element of discriminatory intent.  It is not.  All you need is that the state actor *meant* to single out a plaintiff because of the *protected characteristic* itself.  *See, e.g., Snyder v. Louisiana*, 552 U.S. 472, 485 (2008); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269–70 (1993).  In a school-segregation case, for instance, "the 'intent' which triggers a finding of unconstitutionality is not an intent to harm black students, but simply an intent to bring about or maintain segregated schools." *United States v. Sch. Dist. of Omaha*, 521 F.2d 530, 535 (8th Cir. 1975).  Likewise, a prosecutor who strikes a juror on the basis of race discriminates intentionally even if motivated by a sincere desire to win his case.  *See, e.g., Georgia v. McCollum*, 505 U.S. 42, 59 (1992).

So too here.  While the absence of a legitimate motive may bear on whether the challenged surveillance survives the appropriate level of equal-protection scrutiny, "intentional discrimination" need not be motivated by "ill will, enmity, or hostility" to contravene the Equal Protection Clause. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 662 (S.D.N.Y. 2013) (quoting *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 473 n.7 (11th Cir. 1999)); *see also Cmtys. for Equity v. Mich. High*

*Sch. Athletic Ass'n*, 459 F.3d 676, 694 (6th Cir. 2006) (distinguishing between "an intent to treat two groups differently" and "an intent to harm"); *Garza v. County of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring in part and dissenting in part) ("[T]here can be intentional discrimination without an invidious motive."). Thus, even if NYPD officers were subjectively motivated by a legitimate law-enforcement purpose (no matter how sincere), they've intentionally discriminated if they wouldn't have surveilled Plaintiffs had they not been Muslim.

> 2.   *Is the Alleged Discrimination Nonetheless Legally Justified?*

Once a plaintiff demonstrates treatment different from others with whom he or she is similarly situated and that the unequal treatment is the result of intentional discrimination, "the adequacy of the reasons for that discrimination are . . . separately assessed at equal protection's second step" under the appropriate standard of review. *SECSYS, LLC v. Vigil*, 666 F.3d 678, 689 (10th Cir. 2012). To apply this traditional legal framework to the facts of this case, we must determine the appropriate standard of review (*i.e.*, rational basis, intermediate scrutiny, or strict scrutiny) and then ask whether it is met.[8]

> i.   Level of Scrutiny

At a minimum, intentional discrimination against any "identifiable group" is subject to rational-basis review, which

---

[8] Although other modes of analysis have also been employed, *see, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2596 (2015), we find it appropriate to apply the conventional two-part framework in the context of this case.

requires the classification to be rationally related to a legitimate governmental purpose. *Johnson v. Cohen*, 836 F.2d 798, 805 n.9 (3d Cir. 1987). Where a "quasi-suspect" or "suspect" classification is at issue, however, the challenged action must survive "intermediate scrutiny" or "strict scrutiny."[9] Intermediate scrutiny (applicable to quasi-suspect classes like gender and illegitimacy) requires that a classification "be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). In contrast, strict scrutiny (applicable to suspect classes like race and nationality) is an even more demanding standard, which requires the classification be "narrowly tailored . . . [to] further [a] compelling governmental interest[]." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). Strict and intermediate scrutiny (which we collectively refer to as "heightened scrutiny" to distinguish them from the far less demanding rational-basis review) in effect set up a presumption of invalidity that the defendant must rebut.

Perhaps surprisingly, neither our Court nor the Supreme Court has considered whether classifications based on religious affiliation[10] trigger heightened scrutiny under the

---

[9] "Strict scrutiny" is also triggered in the case of a "fundamental right." While "the right to free exercise of religion" is fundamental, *Lewis*, 518 U.S. at 404, Plaintiffs proceed in this case on the theory that religious affiliation is a protected class.

[10] We refer in this opinion only to discrimination based on religious *affiliation* rather than *involvement*. Case law distinguishes between the two. *See, e.g., United States v. DeJesus*, 347 F.3d 500, 510 (3d Cir. 2003) (Fuentes, J.) ("Because we affirm the District Court's finding that the

Equal Protection Clause. *See* Steven G. Calabresi & Abe Salander, *Religion and the Equal Protection Clause: Why the Constitution Requires School Vouchers*, 65 Fla. L. Rev. 909, 919 (2013); Kenji Yoshino, *Suspect Symbols: The Literary Argument for Heightened Scrutiny for Gays*, 96 Colum. L. Rev. 1753, 1783 (1996). We therefore confront a question of first impression in this Circuit.

Although the answer to this question is not found in binding precedent, we hardly write on a clean slate. To start, it has long been implicit in the Supreme Court's decisions that religious classifications are treated like others traditionally subject to heightened scrutiny, such as those based on race. *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (naming "race" and "religion" as examples of "unjustifiable standard[s]" for a "decision whether to

government's strikes were based on the jurors' heightened religious involvement rather than their religious affiliation, we need not reach the issue of whether a peremptory strike based solely on religious affiliation would be unconstitutional."); *United States v. Stafford*, 136 F.3d 1109, 1114 (7th Cir. 1998) (Posner, C.J.) (explaining that "[i]t is necessary to distinguish among religious affiliation, a religion's general tenets, and a specific religious belief"), *modified*, 136 F.3d 1115 (7th Cir. 1998). Nor do we mean to state a position on the separate "question of whether all religions together constitute a suspect or quasi-suspect class." *Christian Sci. Reading Room Jointly Maintained v. City of San Francisco*, 807 F.2d 1466, 1467 n.1 (9th Cir. 1986) (Norris, J., dissenting from the denial of rehearing *en banc*) (stating this as a separate issue that the panel expressly declined to decide).

prosecute" (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962))); *Burlington N. R.R. v. Ford*, 504 U.S. 648, 651 (1992) (referring to "race" and "religion" as "classif[ications] along suspect lines"); *Friedman v. Rogers*, 440 U.S. 1, 17 (1979) (calling "race, religion, [and] alienage . . . inherently suspect distinctions"); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (same); *United States v. Batchelder*, 442 U.S. 114, 125 n.9 (1979) (listing "race" and "religion" as "unjustifiable standard[s]" under our Constitution (quoting *Oyler*, 368 U.S. at 456)); *Steele v. Louisville & Nashville R.R.*, 323 U.S. 192, 209 (1944) (Murphy, J., concurring) ("The Constitution voices its disapproval whenever economic discrimination is applied under authority of law against any race, creed or color.").

This line of comment can be traced back to the famous footnote four of the Supreme Court's 1938 decision in *Carolene Products*, where the Court suggested that discriminatory legislation should "be subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment" if "directed at particular *religious*, or national, or racial minorities." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938) (citations omitted) (emphasis added).   And even before *Carolene Products*, the Court considered religious discrimination to be a classic example of "a denial of the equal protection of the laws to the less favored classes." *Am. Sugar Ref. Co. v. Louisiana*, 179 U.S. 89, 92 (1900); *see also Hall v. De Cuir*, 95 U.S. 485, 505 (1877) ("Directors of schools in Iowa . . . [cannot] deny a youth of proper age admission to any particular school on account of nationality, color, or religion.").

It is true that these statements are *dicta*. But even so, Supreme Court *dicta* "requires serious consideration," *United States v. Marzzarella*, 614 F.3d 85, 90 n.5 (3d Cir. 2010),

"especially . . . when, as here, we encounter a decades-long succession of statements from the Court," *Myers v. Loudoun Cnty. Pub. Sch.*, 418 F.3d 395, 410 (4th Cir. 2005) (D. Motz, J., concurring in the judgment). Moreover, this *dicta* is consistent with our own. *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 213 (3d Cir. 2013) (identifying "race, religion, [and] alienage" as "inherently suspect distinctions" (quoting *Schumacher v. Nix*, 965 F.2d 1262, 1266 (3d Cir. 1992) (internal quotation marks omitted)); *United States v. DeJesus*, 347 F.3d 500, 510–11 (3d Cir. 2003) (Fuentes, J.) (referring in *dictum* to "religious affiliation" as "a protected class"); *Tolchin v. Supreme Court of New Jersey*, 111 F.3d 1099, 1114 (3d Cir. 1997) (naming "race, religion or alienage" as "suspect distinctions"); *United States v. Friedland*, 83 F.3d 1531, 1537 (3d Cir. 1996) ("[T]he government can[not] refuse to move for a downward[] departure under 18 U.S.C. § 3553(e) [if] . . . base[d] . . . on a constitutionally suspect ground such as race or religion.").

We also are guided by other appellate courts that have subjected religious-based classifications to heightened scrutiny. For instance, both the Eighth and Tenth Circuit Courts have held without fanfare that "[r]eligion is a suspect classification," *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1322 n.10 (10th Cir. 2010); *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 816 (8th Cir. 2008), and the Second and Ninth have done the same in so many words, *see, e.g.*, *United States v. Brown*, 352 F.3d 654, 668 (2d Cir. 2003) (Calabresi, J.) (holding that the exercise of a peremptory strike due to a venire member's religious affiliation would violate *Batson v. Kentucky*, 476 U.S. 79 (1986), because "religious classifications . . . trigger strict scrutiny"); *Christian Sci. Reading Room Jointly Maintained v. City of San Francisco*,

41

784 F.2d 1010, 1012 (9th Cir. 1986) ("It seems clear that an individual religion meets the requirements for treatment as a suspect class."), *amended*, 792 F.2d 124 (9th Cir. 1986).[11]

Today we join these courts and hold that intentional discrimination based on religious affiliation must survive

---

[11] Some appellate courts have recognized the question as an open one, *see, e.g.*, *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 638 (7th Cir. 2007); *Wirzburger v. Galvin*, 412 F.3d 271, 283 (1st Cir. 2005); *Taylor v. Johnson*, 257 F.3d 470, 473 n.2 (5th Cir. 2001) (*per curiam*), but we are not aware of a single circuit court holding that religious classifications are subject to only rational-basis review.

We also note that numerous state courts either have held that religious affiliation is a suspect classification or have issued opinions with strong *dicta* to that effect. *See, e.g.*, *Bagley v. Raymond Sch. Dep't*, 728 A.2d 127, 137 (Me. 1999); *Marrujo v. N.M. State Highway Transp. Dep't*, 887 P.2d 747, 751 (N.M. 1994); *Bd. of Cnty. Comm'rs of Saguache v. Flickinger*, 687 P.2d 975, 982 n.9 (Colo. 1984) (*en banc*); *State v. Correll*, 626 S.W.2d 699, 701 (Tenn. 1982); *Burmaster v. Gravity Drainage Dist. No. 2 of St. Charles Parish*, 366 So. 2d 1381, 1386 n.3 (La. 1978); *Gunn v. Lane County*, 20 P.3d 247, 251 (Or. App. 2001); *LaCava v. Lucander*, 791 N.E.2d 358, 363 (Mass. App. Ct. 2003). *But see State v. Purcell*, 18 P.3d 113, 121 (Ariz. Ct. App. 2001) ("In addition to being a fundamental right, religious affiliation also *may* be a suspect classification under the Equal Protection Clause." (emphasis added)); *State v. Davis*, 504 N.W.2d 767, 771 (Minn. 1993), *cert. denied*, 511 U.S. 1115 (1994); *Casarez v. State*, 913 S.W.2d 468 (Tex. Crim. App. 1994).

heightened equal-protection review.   Before turning more
fully to our reasoning, however, we pause to reiterate that the
term "heightened scrutiny," as we use it, encompasses both
"intermediate scrutiny" and "strict scrutiny."   Because the
City bears the burden of production and proof with respect to
both, *see infra* Part IV(A)(2), we need not—and should
not[12]—determine in connection with its motion to dismiss
which of the two applies, and we leave that question for the
District Court in the first instance when and if it becomes
necessary to decide it.

     In designating a particular classification as "suspect"
or "quasi-suspect" under the Equal Protection Clause, the
Supreme Court generally considers a variety of factors
"grouped around [the] central idea" of "whether the
discrimination embodies a gross unfairness that is [so]
sufficiently inconsistent with the ideals of equal protection to
term it 'invidious.'"   *Watkins v. U.S. Army*, 875 F.2d 699,
724–25 (9th Cir. 1989) (*en banc*) (Norris, J., concurring in the

-------------------------------------------------------

[12] *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936)
(Brandeis, J., concurring) ("It is not the habit of the court to
decide questions of a constitutional nature unless absolutely
necessary to a decision of the case." (quoting *Burton v.
United States*, 196 U.S. 283, 295 (1905))); *Liverpool, N.Y. &
Phila. S.S. Co. v. Comm'rs of Emigration*, 113 U.S. 33, 39
(1885) ("In the exercise of [its] jurisdiction, [the Court
must] . . . never . . . formulate a rule of constitutional law
broader than is required by the precise facts to which it is to
be applied."); *Ala. State Fed'n of Labor v. McAdory*, 325 U.S.
450, 461 (1945) ("It has long been [the Court's] considered
practice not . . . to decide any constitutional question in
advance of the necessity for its decision.").

judgment).  Among these are "whether the . . . class is defined by a[n] [immutable] trait that 'frequently bears no relation to ability to perform or contribute to society'" and "whether the class has been saddled with unique disabilities because of prejudice or inaccurate stereotypes."  *Id.* at 725 (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion)).   But while these factors are those most often considered, "[n]o single talisman can define those groups likely to be the target of classifications offensive to the Fourteenth Amendment . . . ; experience, not abstract logic, must be the primary guide."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 472 n.24 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part).

Courts first have looked with particular suspicion on discrimination based on "immutable human attributes." *Parham v. Hughes*, 441 U.S. 347, 351 (1979) (plurality opinion).   Accordingly, a classification is more likely to receive heightened scrutiny if it discriminates against individuals based on a characteristic that they either cannot realistically change or ought not be compelled to change because it is fundamental to their identities.  *See, e.g., Baskin v. Bogan*, 766 F.3d 648, 655 (7th Cir. 2014) (Posner, J.) (framing this issue as whether "the unequal treatment [is] based on some immutable or at least tenacious characteristic of the people discriminated against" as opposed to a "characteristic[] that [is] easy for a person to change, such as the length of his or her fingernails"); *Watkins*, 875 F.2d at 726 (Norris, J., concurring in the judgment) ("[T]he Supreme Court is willing to treat a trait as effectively immutable if changing it would involve great difficulty, such as requiring a major physical change or a traumatic change of identity.").

Religious affiliation falls within this category.  As we

have recognized in the immigration context,[13] religious affiliation is typically seen as "capable of being changed," yet "of such fundamental importance that individuals should not be required to modify it."[14] *Ghebrehiwot v. Attorney Gen. of U.S.*, 467 F.3d 344, 357 (3d Cir. 2006) (quoting *Escobar v. Gonzalez*, 417 F.3d 363, 367 (3d Cir. 2005)); *see also Baskin*, 766 F.3d at 655 (Posner, J.) (listing "religion" as an example of "a deep psychological commitment" that would qualify for

---

[13] Other courts have drawn on the definition of "immutable" in immigration cases when defining the term in the context of an equal-protection suit. *Latta v. Otter*, 771 F.3d 456, 464 n.4 (9th Cir. 2014) (quoting an immigration case for the proposition that "[s]exual orientation and sexual identity are immutable; they are so fundamental to one's identity that a person should not be required to abandon them" (alteration in original)), *cert. denied*, 135 S. Ct. 2931 (2015).

[14] Aziz Z. Huq, *The Signaling Function of Religious Speech in Domestic Counterterrorism*, 89 Tex. L. Rev. 833, 852 (2011) (recognizing that religion lies "at the core of many individuals' understanding of their identity"); David B. Salmons, Comment, *Toward a Fuller Understanding of Religious Exercise: Recognizing the Identity-Generative and Expressive Nature of Religious Devotion*, 62 U. Chi. L. Rev. 1243, 1258 (1995) (noting the "fundamental role [that religious preference] play[s] in shaping an individual's concept of identity and personhood"); Note, *Reinterpreting the Religion Clauses: Constitutional Construction and Conceptions of the Self*, 97 Harv. L. Rev. 1468, 1474 (1984) ("A society that failed to protect religion would foreclose the individual's choice of the most fundamental part of his identity.").

heightened scrutiny).     Moreover, while some immutable characteristics, such as intellectual disability, are so often correlated with "a person's ability to participate in society" that we frequently deem them to be constitutionally permissible bases for discrimination, *see Baskin*, 766 F.3d at 655, a person's religious affiliation is at the other end of that spectrum.

Religious discrimination, "by [its] very nature," has long been thought "odious to a free people whose institutions are founded upon the doctrine of equality." *Bell v. Maryland*, 378 U.S. 226, 288 (1964) (Goldberg, J., concurring) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 653 (1943) ("[For]     Jefferson     and     those     who     followed him[,] . . . [r]eligious minorities as well as religious majorities were to be equal in the eyes of the political state."); President James Madison, Religious Freedom: A Memorial and Remonstrance Against the General Assessment, in "A Bill Establishing Provision for the Teachers of the Christian Religion," Presented to the General Assembly of Virginia, at the Session of 1785 (1819) ("A just Government . . . will be best supported by protecting every citizen in the enjoyment of his Religion with the same equal hand which protects his person and his property; by neither invading the equal rights of any Sect, nor suffering any sect to invade those of another.").

Courts also are more likely to subject classifications that are "closely associated with inequality" to a more searching inquiry. *Windsor v. United States*, 699 F.3d 169, 1996 (2d Cir. 2012), *aff'd on other grounds*, 133 S. Ct. 2675 (2013).     Thus, if the classification is accompanied by a history of "discrimination based on archaic and overbroad assumptions," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984), or if it has been traditionally used as a tool for the

46

oppression and subordination of minority groups, *see, e.g.,*
*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 495–96
(1989) (plurality opinion), heightened scrutiny often is more
appropriately applied.

The history of religious discrimination in the United
States is intertwined with that based on other protected
characteristics, including national origin and race.[15]  *Saint*
*Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 611–12 (1987)
(noting that "[t]he Ninth edition of the Encyclopedia
Britannica . . . referred to Arabs, Jews, and other ethnic
groups such as Germans, Hungarians, and Greeks, as separate
races" (citations omitted)); *Fong Yue Ting v. United States*,
149 U.S. 698, 717 (1893) (referring to "Chinese laborers" as

---

[15]  Indeed, the close relationship among race, religion,
ethnicity, and national origin is reflected by the allegations in
Plaintiffs' Complaint. *See, e.g.*, Compl. ¶ 40 ("In addition to
targeting Muslims by focusing on mosques, Muslim-owned
businesses, and other Muslim-associated organizations as
subjects of surveillance, the Program also intentionally targets
Muslims by using ethnicity as a proxy for faith."); *id.* ¶ 41
("As part of the Program, the Department has designated
twenty-eight countries and 'American Black Muslim' as
'ancestries of interest.'"); *id.* ¶ 53 ("To facilitate future
surveillance of entire American Muslim communities, the
NYPD has created maps indicating the locations of mosques,
restaurants, retail establishments, and schools owned by or
serving Muslims, as well as ethnic populations from heavily
Muslim countries."); *id.* ¶ 55 ("The NYPD also inspects
records of name changes and compiles databases of new
Muslim converts who take Arabic names, as well as Muslims
who take names that are perceived to be 'Western.'").

47

"of a distinct race and religion"); *In re Halladjian*, 174 F. 834, 838 (C.C.D. Mass. 1909) ("A Hindoo . . . differs in color no less from a Chinaman than from an Anglo-Saxon . . . ."); Khaled A. Beydoun, *Between Muslim and White: The Legal Construction of Arab American Identity*, 69 N.Y.U. Ann. Surv. Am. L. 29, 33 (2013) (noting that "the conflation of Arab and Muslim identity was deeply entrenched within the courts during the Naturalization Era" and that "Islam was treated as an ethno-racial identity").

It is thus unsurprising that tampering with religious affiliation brings into play the same concerns of inequality. Though "[n]othing but the most telling of personal experiences in religious persecution suffered by our forebears could have planted our belief in liberty of religious opinion any more deeply in our heritage," *Schempp*, 374 U.S. at 214 (citation omitted), we have struggled to guarantee religious equality since our Nation's founding. *See generally Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 9–10 (1947); *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 616 (1987); *Schware v. Bd. of Bar Exam'rs of N.M.*, 353 U.S. 232, 236 (1957); *Murdock v. Pennsylvania*, 319 U.S. 105, 109 (1943). Different religious groups have borne the brunt of majority oppression during different times, and the battle against religious prejudice continues. *See, e.g.*, U.S. Patriot Act of 2001, Pub. L. 107-56, § 102(a)(3), 115 Stat. 274 ("The acts of violence that have been taken against Arab and Muslim Americans since the September 11, 2001, attacks against the United States should be and are condemned by all Americans who value freedom."); Brief in Support of Appellants by *Amici Curiae* the Asian American Legal Defense & Education Fund & 17 Other Non-Governmental Organizations Supporting Civil Rights for American Muslims 11–22.

In light of this history, distinctions between citizens on

48

religious grounds pose a particularly acute "danger of stigma and stirred animosities." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 728 (1994) (Kennedy, J., concurring in the judgment); *see also Wright v. Rockefeller*, 376 U.S. 52, 67 (1964) (Douglas, J., dissenting) ("When racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion . . . are generated . . . ."); *Kunz v. New York*, 340 U.S. 290, 313 (1951) (Jackson, J., dissenting) ("If any two subjects are intrinsically incendiary and divisive, they are race and religion."). That "[c]enturies of experience testify that laws aimed at one . . . religious group . . . generate hatreds and prejudices which rapidly spread beyond control," *Am. Commc'ns Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 448 (1950) (Black, J., dissenting), also counsels in favor of heightened scrutiny.

A final relevant consideration is whether the Legislative and Executive Branches have concluded that a form of discrimination is inherently invidious. In holding gender to be a "quasi-suspect" classification deserving of intermediate scrutiny, the Supreme Court noted, for instance, in *Frontiero* that, because Congress is "a coequal branch of Government," its "conclu[sion] that classifications based upon sex are inherently invidious . . . [was] not without significance to the question [then] under consideration." 411 U.S. at 687–88.

Many of the same statutes that foreclose sex-based discrimination, including Title VII of the Civil Rights Act of 1964 cited by the *Frontiero* Court, *see id.* at 687, also forbid religious discrimination. *See, e.g.*, 42 U.S.C. § 2000e-2 (making it an "unlawful employment practice" for an employer to discriminate based on "race, color, religion, sex, or national origin"). And from the passage of the Civil Rights

Act of 1875,[16] to those designed to strengthen national security in our post-September 11 world,[17] that commitment to the "sacrosanct . . . concept" of equality among "all religious . . . groups," *see* U.S. Patriot Act of 2001 § 102(a)(3), is embodied throughout the U.S. Code. *See, e.g.*, 2 U.S.C. § 1311(a) (employment); 12 U.S.C. § 3106a(1)(B), (2)(B) (banking); 12 U.S.C. § 4545 (fair housing); 22 U.S.C. § 2504(a) (Peace Corps service); 49 U.S.C. § 40127 (air transportation and use of private airports).

The same commitment to religious equality is seen in the pronouncements of the Executive Branch, from those of our first President, George Washington, to our current President, Barack Obama. *See, e.g.*, President George Washington, Address to the Members of the New Church in Baltimore (Jan. 1793), *in* 2 Jared Sparks, *Life of George Washington Commander-in-Chief of the American Armies: to Which Are Added, His Diaries and Speeches; and Various*

---

[16] Act of Mar. 1, 1875, ch. 114, 18 Stat. 335 ("[I]t is essential to just government we recognize the equality of all men before the law, and hold that it is the duty of government in its dealings with the people to mete out equal and exact justice to all, of whatever nativity, race, color, or persuasion, religious or political . . . .").

[17] *See, e.g.*, U.S. Patriot Act of 2001, Pub. L. 107-56, § 102(a)(3), b(3), 115 Stat. 274 ("The concept of individual responsibility for wrongdoing is sacrosanct in American society, and applies equally to all religious, racial, and ethnic groups. . . . [T]he Nation is called upon to recognize the patriotism of fellow citizens from all ethnic, racial, and religious backgrounds.").

*Miscellaneous Papers Relating to His Habits & Opinions*
314, 314–15 (1839) ("In this enlightened age, and in this land
of equal liberty, it is our boast that a man's religious tenets
will not forfeit the protection of the laws, nor deprive him of
the right of attaining and holding the highest offices that are
known in the United States."); President Harry Truman,
Special Message to the Congress on Civil Rights (Feb. 2,
1948) ("Racial, religious and other invidious forms of
discrimination deprive the individual of an equal chance to
develop and utilize his talents and to enjoy the rewards of his
efforts."); President Theodore Roosevelt, Sixth Annual
Message to Congress (Dec. 3, 1906) ("[W]e must treat with
justice and good will all immigrants who come here under the
law[,] . . . [w]hether they are Catholic or Protestant, Jew or
Gentile . . . ."); President Barack Obama, State of the Union
Address (Jan. 28, 2014) ("[W]e believe in the inherent dignity
and equality of every human being, regardless of race or
religion, creed or sexual orientation.").

For these reasons, we conclude that classifications on
the basis of religious affiliation are subject to heightened
scrutiny under the Equal Protection Clause.

ii.     Evaluation of Means and Ends

The final step in evaluating an equal-protection claim
is to examine the challenged action's "means" and "ends" and
the "fit" between the two.    The specific analysis differs
depending on the level of scrutiny that applies.    The higher
the scrutiny required, the more persuasive must be the
governmental objective and the snugger the means-ends fit.
Thus, while it usually matters little for purposes of rational-
basis review that a governmental interest is not exceedingly
important or that "other means are better suited to the
achievement of governmental ends," heightened scrutiny
demands a much stronger justification and a much tighter

relationship "between the means employed and the ends served." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 77–78 (2001) (O'Connor, J., dissenting).

Also increasingly demanding is the standard of proof. While the rational-basis standard usually puts the burden of proof on the classification's *opponent* and "permits a court to hypothesize interests that *might* support [the governmental] distinctions," *id.* at 77 (emphasis added) (citing *Heller v. Doe*, 509 U.S. 312, 320 (1993); *R.R. Ret. Bd. v. Fritz*, 449 U.S. 155 (1980)), the burden of justification under both intermediate and strict scrutiny "is demanding and . . . rests entirely on the State," *United States v. Virginia*, 518 U.S. 515, 533 (1996). *See also Hogan*, 458 U.S. at 724 (discussing the standard and burden for intermediate scrutiny); *Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2419 (2013) (strict scrutiny).

Here, the City argues that "[a] comprehensive understanding of the makeup of the community would help the NYPD figure out where to look—and where not to look— in the event it received information that an Islamist radicalized to violence may be secreting himself in New Jersey." City Br. 50. It even goes so far as to assert that "it would be *irresponsible* for the NYPD not to have an understanding of the varied mosaic that is the Muslim community to respond to such threats." *Id.* (emphasis added). But because heightened scrutiny applies in this case, we cannot accept the City's invitation to dismiss Plaintiffs' Complaint based on its assurance that the Program is justified by national-security and public-safety concerns. Rather, the burden of producing evidence to overcome heightened scrutiny's presumption of unconstitutionality is that of the City, *cf. Aiken v. City of Memphis*, 37 F.3d 1155, 1163 (6th Cir. 1994) (*en banc*) ("When, as here, a race-based affirmative action plan is subjected to strict scrutiny, the party defending the plan bears the burden of producing evidence

that the plan is constitutional."), and must be met *after* its Motion to Dismiss.

To be clear, we acknowledge that a principal reason for a government's existence is to provide security. But while we do not question the legitimacy of the City's interest, "[t]he gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000). Rather, heightened scrutiny requires that the relationship between the asserted justification and discriminatory means employed "be substantiated by objective evidence." *Patrolmen's Benevolent Ass'n of New York v. City of New York*, 310 F.3d 43, 53 (2d Cir. 2002). "[M]ere speculation or conjecture is insufficient," *id.*, as are appeals to "'common sense' which might be inflected by stereotypes," *Reynolds v. City of Chicago*, 296 F.3d 524, 526 (7th Cir. 2002) (Posner, J.). *See also Lomack v. City of Newark*, 463 F.3d 303, 310 (3d Cir. 2006) (citing with approval *Patrolmen's Benevolent Ass'n*, 310 F.3d at 52–53).

And "[e]ven in the limited circumstance" where a suspect or quasi-suspect classification "is permissible to further [an important or] compelling state interest, the government is still 'constrained in how it may pursue that end.'" *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (second alteration in original) (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 (1996) (internal quotation marks and citation omitted)). While "[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality," *Heller*, 509 U.S. at 321 (internal quotation marks omitted), strict scrutiny requires that "the classification at issue . . . 'fit' with greater precision than any alternative means," *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986) (plurality opinion) (citing John Hart Ely, *The Constitutionality of*

*Reverse Racial Discrimination*, 41 U. Chi. L. Rev. 723, 727 n.26 (1974)).  Intermediate scrutiny falls somewhere in between the two, asking if there is a "direct, substantial relationship between objective and means." *Hogan*, 458 U.S. at 725.

No matter how tempting it might be to do otherwise, we must apply the same rigorous standards even where national security is at stake.  We have learned from experience that it is often where the asserted interest appears most compelling that we must be most vigilant in protecting constitutional rights.  "[H]istory teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 635 (1989) (Marshall, J., dissenting); *see also Grutter*, 539 U.S. at 351 (Scalia, J., concurring in part and dissenting in part) ("The lesson of *Korematsu* [*v. United States*, 323 U.S. 214, 223 (1944)] is that national security constitutes a 'pressing public necessity,' though the government's use of [a suspect classification] to advance that objective must be [appropriately] tailored."); *Skinner*, 489 U.S. at 635 (Marshall, J. dissenting) ("The World War II relocation-camp cases and the Red scare and McCarthy-era internal subversion cases are only the most extreme reminders that when we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it." (citations omitted)).

Today it is acknowledged, for instance, that the F.D.R. Administration and military authorities infringed the constitutional rights of Japanese-Americans during World War II by placing them under curfew and removing them from their West Coast homes and into internment camps.  Yet when these citizens pleaded with the courts to uphold their constitutional rights, we passively accepted the Government's representations that the use of such classifications was

54

necessary to the national interest. *Hirabayashi*, 320 U.S. 81; *Korematsu*, 323 U.S. 214. In doing so, we failed to recognize that the discriminatory treatment of approximately 120,000 persons of Japanese ancestry was fueled not by military necessity but unfounded fears. *See United States v. Hohri*, 482 U.S. 64, 66 (1987); *see also* Act to Implement Recommendations on the Commission of Wartime Relocation and Internment of Civilians, Pub. L. 100-383, § 2(a), 102 Stat. 903-04 (1988). Given that "unconditional deference to [the] government['s] . . . invocation of 'emergency' . . . has a lamentable place in our history," *Patrolmen's Benevolent Ass'n*, 310 F.3d at 53–54 (citing *Korematsu*, 323 U.S. at 223), the past should not preface yet again bending our constitutional principles merely because an interest in national security is invoked.

In sum, because Plaintiffs have plausibly alleged that the City engaged in intentional discrimination against a protected class, and because that classification creates a presumption of unconstitutionality that remains the City's obligation to rebut, Plaintiffs have stated a claim under the Equal Protection Clause of the Fourteenth Amendment.

**B.     First-Amendment Claims**

We finally reach Plaintiffs' claims under the Religion Clauses of the First Amendment. They allege violations of both the Establishment Clause and the Free Exercise Clause, which respectively prohibit the making of any "law respecting an establishment of religion" or "prohibiting the free exercise thereof." U.S. Const. Amend. I.

Plaintiffs bring both claims under the theory that the First Amendment demands strict governmental neutrality among religious sects. While it is intuitive that discriminatory conduct that inhibits a person's full religious

expression may run afoul of the Free Exercise Clause of the First Amendment, under the facts here the same is counterintuitive for the Establishment Clause, as the latter "tend[s] to [involve] challenge[s] to governmental endorsement." *Catholic League for Religious & Civil Rights v. City of San Francisco*, 624 F.3d 1043, 1050 n.20 (9th Cir. 2010) (*en banc*) (emphasis added). *But see Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2008) (McConnell, J.) ("[S]tatutes involving discrimination on the basis of religion, including interdenominational discrimination, are subject to heightened scrutiny whether they arise under the Free Exercise Clause, the Establishment Clause, or the Equal Protection Clause . . . ." (citations omitted)). However, a full discussion of either Religion Clause and its application to our case is unnecessary, as we confine ourselves to the City's arguments raised in its Motion to Dismiss. Those arguments are unpersuasive.

The City first argues that, "according to a three month fact finding investigation by the New Jersey Attorney General, the surveillance Program did not violate New Jersey civil or criminal law." City Br. 44. That this argument could defeat a federal constitutional claim, let alone on a motion to dismiss, borders on the frivolous. Aside from a court's inability to consider such matters extraneous to the pleadings under Federal Rule of Civil Procedure 12(b)(6), it is the United States Constitution—not the "civil or criminal law" of New Jersey—that Plaintiffs seek to enforce. But even more fundamentally, the New Jersey Attorney General's legal conclusion is not helpful in determining whether the City violated Plaintiffs' constitutional rights. "It is emphatically the province and duty of the judicial department"—not the New Jersey executive—"to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

The City's only other argument (aside from a few

56

consider this argument waived. *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (Alito, J.) ("[A]rguments raised in passing (such as in a footnote), but not squarely argued, are considered waived.").

But even if we were to consider the City's halfhearted assertion that allegations of overt hostility and prejudice are required to make out claims under the First Amendment, this argument would easily fail, just as did the identical argument with respect to the Equal Protection Clause. While the contours of neither the Free Exercise nor the Establishment Clause are static and well defined, courts have repeatedly rejected the notion that either Clause "is . . . confined to actions based on animus." Laurence H. Tribe, *American Constitutional Law* §§ 5–16, at 956 (3d ed. 2000) ("[A] law that is not neutral or that is not generally applicable can violate the Free Exercise Clause without regard to the motives of those who enacted the measure."); *see also Shrum v. City of Coweta*, 449 F.3d 1132, 1144–45 (10th Cir. 2006) (McConnell, J.) ("Proof of hostility or discriminatory motivation may be sufficient to prove that a challenged governmental action is not neutral, but the Free Exercise Clause is not confined to actions based on animus." (citations omitted)); *Allen v. Morton*, 495 F.2d 65, 72 (D.C. Cir. 1973) (Tamm, J., concurring) (noting that, under the Establishment Clause, "good motives cannot save impermissible actions"). At bottom, the City needs something other than this threadbare argument based on the absence of subjective hostility to avoid a non-swinging strikeout.

## V.    CONCLUSION

The allegations in Plaintiffs' Complaint tell a story in which there is standing to complain and which present constitutional concerns that must be addressed and, if true, redressed. Our job is judicial. We "can apply only law, and

must abide by the Constitution, or [we] cease to be civil courts and become instruments of [police] policy." *Korematsu*, 323 U.S. at 247 (Jackson, J., dissenting).

We believe that statement of Justice Jackson to be on the right side of history, and for a majority of us in quiet times it remains so . . . until the next time there is the fear of a few who cannot be sorted out easily from the many. Even when we narrow the many to a class or group, that narrowing—here to those affiliated with a major worldwide religion—is not near enough under our Constitution. "[T]o infer that examples of individual disloyalty prove group disloyalty and justify discriminatory action against the entire group is to deny that under our system of law individual guilt is the sole basis for deprivation of rights." *Id.* at 240 (Murphy, J., dissenting).

What occurs here in one guise is not new. We have been down similar roads before. Jewish-Americans during the Red Scare, African-Americans during the Civil Rights Movement, and Japanese-Americans during World War II are examples that readily spring to mind. We are left to wonder why we cannot see with foresight what we see so clearly with hindsight—that "[l]oyalty is a matter of the heart and mind[,] not race, creed, or color." *Ex parte Mitsuye Endo*, 323 U.S. 283, 302 (1944).

We reverse and remand for further proceedings consistent with this opinion.

ROTH, <u>Circuit Judge</u>, concurrence.

I agree that plaintiffs have demonstrated standing and made sufficient allegations of violations of equal-protection rights.. I differ from the majority in its failure to determine whether "intermediate scrutiny" or "strict scrutiny" applies here. In our determinations so far, we have also, I believe, made the findings necessary to resolve the issue of the appropriate level of scrutiny.

In my opinion, "intermediate scrutiny" is appropriate here. I say this because "intermediate scrutiny" is the level applied in gender discrimination cases. I have the immutable characteristic of being a woman. I am happy with this condition, but during my 80 years on this earth, it has caused me at times to suffer gender discrimination. My remedy now for any future gender discrimination would be reviewed with "intermediate scrutiny." For that reason, I cannot endorse a level of scrutiny in other types of discrimination cases that would be stricter than the level which would apply to discrimination against me as a woman.